UNITED STATES of America
v.
Charles L. SOBER, Appellant.

UNITED STATES of America
v.
Richard W. HEINEMAN, Appellant.

UNITED STATES of America
v.
John E. CYPHER, Appellant.

UNITED STATES of America
v.
Jack C. REESE, Appellant.

UNITED STATES of America
v.
Ira L. SOBER, Appellant.
Nos. 13037–13041.

United States Court of Appeals
Third Circuit.

Argued April 19, 1960.

Decided June 24, 1960.

---

Melvin Schwartz, Alexander Cooper, Pittsburgh, Pa. (Irving Sikov, Pittsburgh, Pa., on the brief), for appellants.

Hubert I. Teitelbaum, U. S. Atty., John R. Gavin, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Of the several points argued in this criminal appeal, the only one that needs any detailed analysis is the assertion that the United States Attorney deprived the defendants of a fair trial by highly prejudicial and inflammatory remarks in the course of his summation. However, for a sound understanding of that question it is necessary to state and dispose of the basic situations arising from the two multiple count indictments against the five appellants.

All of the appellants were either officers, directors or both of the Old Freeport Bank, Freeport, Pennsylvania. That institution's deposits were insured with the Federal Deposit Insurance Corporation. The indictments charged violations of 18 U.S.C. § 220 which forbids receipt by bank officials and employees of gifts or commissions for procuring bank loans; 18 U.S.C. § 371, the conspiracy statute; 18 U.S.C. § 656 covering embezzlement by bank officials and employees; and 18 U.S.C. § 1005 which deals with the making of false entries in books or records of insured banks.

On the offenses under 18 U.S.C. § 220, Heineman, a physician and director of the bank and Charles Sober, executive vice-president and a director were found guilty; the first for receiving a fee for procuring a loan to Leo Gallagher and his wife; the second for aiding and abetting the transaction. The evidence showed that Gallagher, a tavern owner, needed $15,000 to buy out his partner's interest and to renovate the premises. Sober told him that the limit of a bank loan would be nine or ten thousand dollars and referred him to Heineman for an additional loan. Heineman posted a certificate of deposit in the amount of $8,000 as collateral security for a bank loan to Gallagher of $17,000. Of the latter amount Heineman was paid $2,000 "for his trouble". Gallagher regarded the payment as a "kick back". From more than adequate evidence the jury was entitled to find Heineman and Charles Sober guilty, as it did, not only as to the substantive crime itself but for conspiracy to commit it.

A loan to John R. Burkett and his wife followed the same pattern. These people

were in serious financial difficulty. Unable to obtain a loan elsewhere, they sought a loan from the Freeport Bank. Their total obligations amounted to $5,100. Charles Sober sent them to Heineman. The latter posted a $3,000 certificate of deposit as additional security to the heavily mortgaged Burkett home. The bank loaned the Burketts $5,900. Heineman obtained a fee out of this in the sum of $800. Here too there was solid evidence that the $800 loaned by the bank over and above the actual needs of the Burketts went to Heineman as his commission. The convictions of Charles Sober and Heineman for both the Section 220 crime and conspiracy were justified by the record.

A loan to Gustave C. Heyman and his wife by the bank in the sum of $46,000 resulted in the indictment of Charles Sober and appellant Cypher, also a bank director. There was testimony at the trial that Heyman was refused a $23,000 bank loan; that Sober referred him to Heineman as a person who might loan him the additional $10,000 over the bank limit of $13,000; that the negotiations with Heineman fell through. Later Heyman contacted Cypher who himself borrowed $10,000 from the bank. With this he bought a certificate of deposit in that sum and assigned it to the bank as further collateral security for a loan by the bank to Heyman and his wife in the amount of $46,000. Half that money was paid to Cypher and his wife by a certificate of deposit which was assigned to the bank as additional security for the loan. Heyman paid interest on the entire $46,000. Here too there was sufficient proof of Sober's tie-in to the loan and of the $23,000 certificate of deposit being payment to Cypher for obtaining the loan to the Heymans and of the conspiracy by Sober and Cypher to effectuate the result.

In the first of the false entry counts, Ira Sober, executive vice-president and a director and Reese, cashier and a director, were charged with overstating the bank's cash position by $725 in the general ledger with intent to injure and defraud the bank or the F.D.I.C. or an agent or examiner appointed to examine the bank's accounts. This arose out of an arrangement by Sober to purchase an automobile from one Piccoli. The evidence indicated that Sober had Reese issue a cashier's check for $725 to Piccoli. The check was later ostensibly protected by a fraudulent sales agreement assigned to the bank. The proof was clear as to the falsification of the records and as the trial judge said in sustaining the convictions of Reese and Ira Sober on this count, "The evidence of intentional deceitfulness was overwhelming".

The remaining false entry counts concerned the overstatement in bank records and in two call reports to the F.D.I.C. of the outstanding balance of mortgage loans insured by the Federal Housing Administration. Proof of the overstatement was complete. Evidence of criminal intent was present as the effect of the entries was to represent the bank in better condition than it was in fact. The element of wilfulness was definitely established as a jury question. The convictions of Ira and Charles Sober and Reese under these counts were amply supported by the evidence.

This brings us to consideration of the District Attorney's summation. It came at the conclusion of a five week trial of a complex, bitterly defended group of criminal charges against five defendants. The defense attorney had talked for forty-five pages of the printed appendix. That address, while it is not at all urged by the government as a reason for any part of the prosecution's argument, does reveal unmistakably the defense tactics and the kind of steamy atmosphere in which the District Attorney of necessity spoke. For example, in the defense closing the testimony of the Gallaghers and of Burkett was separately characterized as a "phony story". As to evidence of the federal bank examiner Canaday, the defense attorney rhetorically asked, "Why do we have to have concoctions of that kind?" And accusing Canaday of withholding evidence, he said, "Why do you keep it from the jury? It is not

right, it is not fair * * *." Defense counsel told the jury a long story of a man, convicted of murder on circumstantial evidence who had served two and a half years of his ten to twenty year sentence when the person who had actually committed the crime confessed. Throughout the defense summation, its main theme was "What is behind all this members of the jury? I'm asking this question over and over again." Towards the end of the argument counsel plainly inferred that he meant two giant banks who have "absorbed and eaten up every bank around here" and said, "I wonder how much the success of this bank has eaten into the hearts of these competitors * * *."

■ It was immediately following those remarks that the District Attorney made his closing argument. And it would seem he recognized that he needed his every effort to overcome prejudice, not to create it. In an affirmative, well coordinated presentation, for fifty-eight pages of the appendix, he solidly marshalled the trial evidence as to the defendants. The record was damning against them and he adhered to the record.[1]

■ Appellants insist that the District Attorney in a "hard, cold, calculating manner" resorted to passion and prejudice to convict the defendants. They ascribe to him, "personal vindictiveness". They say "The final ten pages of the Transcript contain and are indicative of the venom and prejudice in the government counsel's mind." In their zeal to attack the District Attorney at most they merely show that he prosecuted these difficult cases with earnestness and vigor. He struck hard blows but fair ones. On seven of the various counts motions for acquittal were granted. On seven more counts there were verdicts of not guilty. On one of the remaining counts the judge set the conviction aside. On the balance of twenty-three counts verdicts of guilty were sustained by the trial court. The District Attorney used every legitimate means to bring about just convictions and this he was bound to do by his oath. Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314.

Appellants do not print the summations in their entirety but fortunately they are part of appellee's appendix. Thorough study of the government closing does not reveal a single instance where the District Attorney failed to live up to his high obligation.

Specifically, appellants say first, government counsel stated that Miss Cypher, daughter of appellant John Cypher, "was placed on the stand simply to gain the sympathy of the jury." They don't print the District Attorney's complete com-

---

1. The District Attorney's final words to the jury as he left his case with that tribunal were:

"Jury duty is one of the highest services that most citizens ever will have the opportunity to perform for their government. I don't ask you to convict anybody because I ask you to. I don't ask you to do so out of any prejudice that you might have. If you have any prejudice against anybody, be they bankers, doctors or what-have-you, or even lawyers, please dismiss it from your mind, and act only on the evidence, but if you believe—if you believe that the testimony as given by the Gallaghers, by the Burketts, by Devereaux, by Mr. Heyman, and by the various other people who testified here on behalf of the government, all of which was consistent, all of which is substantiated by the books, records and documentary evidence—if you believe that, then it is your duty as good American citizens to return a guilty verdict as to each indictment and as to each count of each indictment.

"If, on the other hand you do not believe it, if you believe that all these people were not telling the truth but that instead the stories as told by Mr. Sober and Dr. Heineman can somehow be worked together—if you believe that, then of course you should acquit as to any such count.

"We only ask that you give it your serious consideration. I know you will, and return such verdict as appears to be just. If that is done then the government wins the case regardless of what the result is. We are interested only in seeing that justice be done to everyone of our citizens.

"Thank you very much."

ment and they don't print Miss Cypher's testimony or that of her mother at all. It is quite enough to simply quote what the District Attorney said:

"I was surprised to hear the rather eloquent plea for sympathy that was made, in fact that has been an undertone all through the case. That's why Mrs. Cypher was put on the stand, but imagine even young Miss Cypher was put on the stand. What for? What did she contribute to determining what the facts were in this case? That Mr. Heyman had called Mr. Cypher on numerous occasions. Mr. Heyman told you that. Mr. Cypher told you that. Nobody denied that. Mrs. Cypher told you. The young girl was put on the stand only for one purpose, to gain sympathy."

The District Attorney never impugned Miss Cypher's integrity, his expressed thought regarding it was: "Sure, Mrs. Cypher told the truth; she says he used to come in often. *Young Miss Cypher said the same thing.*" (Emphasis supplied.)

Next it is complained that the government stated "that Mr. Sober was setting up his own straw-man and then throwing balls to knock it down. *There is nothing in the record which would justify such comment.*" (Emphasis supplied.) Again printing the full sequence reveals the callous indifference of the assertion to the truth. The language reads:

"Another thing I want to bring out, Mr. Sober is charged with aiding and abetting in quite a few counts. His counsel as pointed out to you numerous times Mr. Sober did not get one penny. Well ladies and gentlemen, nobody charged that Mr. Sober got any of that money. He set up his own strawman and he's very effectively throwing balls to knock it down, but we don't charge he got any of the kickback money. We have no knowledge; we are not implying we do have, and we are not making that accusation. We are

saying instead, Mr. Sober made it possible for Dr. Heineman or for Mr. Sober or Mr. Cypher to get the commission, fee or thing of value, and if he did that, under the law he is equally guilty with Dr. Heineman whether or not he got a cent."

The third claim is that the government argued "Sober should be convicted because he owned thirty per cent of the bank * * * that there is a crime involved in Mr. Sober owning a certain amount of stock." That was not what the government said. The government stressed that since Charles Sober was charged with aiding and abetting and conspiracy with Heineman or Cypher, whether he received any money from the loans was unimportant. However, because the defense was alleging he had received nothing and constantly querying why was he accused at all, the District Attorney pointed out that Sober did also profit. He noted that Charles Sober and his brother Ira owned almost 30 per cent of the bank's stock and referring to the certificates of deposit said:

"That certificate of deposit paid interest at two and a half per cent. A certificate of deposit means the money has to stay in the bank for three years, and except in dire circumstances, three years, it had to stay there, at two and a half per cent interest. He had to pay for the money, and he loaned the money out at six per cent, so Mr. Sober was not entirely without any gain from the entire transaction. There was something coming back to him. That is important only because—not because that is a part of the charge, it isn't part of the charge. He is charged with aiding and abetting Dr. Heineman or Mr. Cypher, but it is important because you were continually told, Charles Sober got nothing. Why was he here?"

Accusation number 4 in appellants' brief reads:

"One of the more shocking statements take place where Government counsel stated that there was a

scheme where loans were deliberately authorized for an amount less than requested. There is not one scintilla of evidence in the record which would show that the Loans Committee of the Bank deliberately made false loan authorizations. Moreover, this is not part of the charge in the indictment and this in itself constitutes reversible error. Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252."

This has to do with the Gallagher episode in which Gallagher testified he asked Sober for a $15,000 loan. Sober told him, according to Gallagher, he could only give him nine or ten thousand. Sober said he told Gallagher the bank would only give him nine. Gallagher then testified that he asked Sober "Do you think, do you know anybody would want to lend out some money?" After a couple of days Gallagher saw Sober who referred him to Heineman. Gallagher following that, entered into the arrangement with Heineman above outlined. It was in referring to that whole ugly operation that the District Attorney said, " * * * he asked for fifteen, Sober says, 'We will only give you nine or ten.' That was part of the scheme. That was part of the plot." And if the government evidence was to be accepted, as the jury did accept it, Sober's handling of the loan to Gallagher was part of the plot to see that Heineman obtained a kickback of $2,000.

Appellants go on commenting regarding other things the District Attorney said in the course of his closing, none of which is more helpful to their proposition than those already cited. Taking up the final ten pages of the transcript alluded to, the initial objection is to the story of which the District Attorney stated the case reminded him. As appellants' brief puts it the "story which took place at a funeral where three individuals decided to put money in the casket of a dead friend. One man put in $10.00, another man put in $10.00, and a third man, who from his statement obviously indicates it to be one of the ap-

pellants took the $20.00 cash and put in a check for $30.00. He (the District Attorney) continues from there and compares Ira L. Sober and Jack C. Reese with a cashier who takes money out of the Bank and puts it in his pocket." It seems to us that even from the scant sketching of the Ira Sober, Reese, Piccoli scheming in our opening statement, the illustration is no misfit. Another illustration by the District Attorney is assailed. What the former said was:

"There are certain other charges that I wanted to discuss if I may. The embezzlement charges. Dr. Heineman does not deny that he got two $50 payments from the Burketts which he didn't deliver to the bank, and at that time it was the bank's money. Why? The Burketts still owed the mortgage to the bank. Now he had no right at that time to assume that the Burketts were or were not going to be able to make the payments. They were still paying; he had no right to assume that they were going to default. If the man would have been fortunate enough to get work regularly, maybe they wouldn't have defaulted, so on that day he had no right to keep that $50. What is his excuse? That later on he took the Burkett's house away from them and he paid off the note. See, he had the deed. He took the Burkett's house and paid the note. Naturally that included the two $50 payments that hadn't been paid before; but he took two $50 payments and admits it. He admits it. The only thing he says, 'I paid it back.'

"If a robber coming out of one of the downtown banks with a sack of money in his hand and a smoking revolver, would run into our good friends Mr. Puddister and Mr. Huigens who would identify him, and he would say, 'Here's the money back, I'm sorry I did it,' that wouldn't make it any less a bank robbery, would it, and it wouldn't make him less a bank robber if the

man said, 'I've only had the money for two minutes.' It would still be a robbery, and it is still an embezzlement whether or not it was paid back, and as the money Ira received from Mr. Paz and paid back some weeks later. That too, that caused a false entry in the bank, because it was not reported as having been received."

It is immediately seen that the reference on oral argument to the robber and the smoking gun was taken out of context and given a connotation not in the summation itself and impossible to draw from the complete statement to the jury. It is the latter which concerns us. Every defendant is of course jealously protected against inflammable statements, against prejudicial statements not based upon the evidence or fair and reasonable deductions from it, but as Judge Learned Hand said, "To shear him [the District Attorney] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; * * *." DiCarlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368. But this was no foul blow by the District Attorney. As he gave his example to the jury, it was an apt comparison that he made. He was not trying to have the defendants found guilty of bank robbery with a gun. He was sharply demonstrating that though the jury might believe Heineman, when he said that after taking two fifty dollar payments from Burkett he later paid them back, Heineman was still guilty of embezzlement under the facts. And that Ira Sober, paying back some weeks later the bank's money he had received from Paz, a bank employee, did not wipe out his initial offense. Just as a person who robbed a bank and returned the stolen money two minutes later continued to be guilty of his original crime.

Neither the above analogy or the story were challenged either at the time delivered or thereafter. The only objections to the government closing argument appear in the footnote.[2] And it might be here noted, though it applies to the whole trial, that appellants' attorney concluded his argument to the jury by saying: "I want to take this occasion to thank you, Mr. Teitelbaum and all his crew and this Court for the wonderful treatment we have received during the time we were here. Thank you."

Other objections against the last ten pages of the transcript include reference to Heineman as "Old Doc". This is criticized but that very expression was brought into the trial by appellant Charles Sober. The latter was called "Big-Hearted Charles Sober" and "C. D. Charlie Sober". The man who engineered the fantastic deal whereby Gustave Heyman was loaned $23,000 and paid interest on $46,000, the balance going to him was called "Big-Hearted John Cypher". The transactions recounted were described as "loan-sharking", "loan shark deal", "C. D. Racket" and "Blood money".[3] Those terms were abrasive but

2. "Mr. Schwartz: Counsel for the defendants request the court to withdraw a juror on the basis that throughout the argument by counsel for the government certain terms were used in an effort to prejudice the rights of the defendants in the eyes of the jury.

"A number of these terms are 'Stories', 'Loan sharking,' 'Old Doc,' 'Big-hearted Cypher,' 'Sharking a loan,' 'C. D. Racket,' 'C. D. Charley Sober,' 'Blood money,' together with other terms not enumerated herein, and statements concerning what Mr. Canaday could have testified but didn't in regard to—you better say what they are.

"Mr. Cooper: In regard to 'Correct' and 'Attest' statements, statements by Mr. Teitelbaum concerning the legal significance and time element of mechanics liens, and statements as to who this examiner was who questioned Ira Sober and Jack Reese, which examiner was identified in the case as F.D.I.C. Examiner Brown.

"The Court: Motion is denied."

3. The phrase "blood money" appears in the following sequence:

"Now the evidence seems clear in this case that in each instance the loans were purposely made too low, but if that

were no wild appeals to prejudice; they had support in the evidence unfolded of the wretched deals in which the respective appellants involved the particular unfortunate loan applicants.

We have examined appellants' other points i. e. questions and remarks of the District Attorney other than at closing; manner in which the government presented its evidence; evidence allegedly improperly admitted; restriction of Tarr testimony; allegations re testimony of the Burketts and Mr. Heyman. Regarding all of these, a close examination of the voluminous record convinces us that no substantial error has arisen out of this trial because of them.[4]

The judgment of the district court will be affirmed.

BIGGS, Chief Judge, with whom HASTIE, Circuit Judge, joins (concurring).

Though we concur in the ruling that the judgments of conviction against the defendants must be affirmed we cannot join with our Brother McLAUGHLIN in praising the manner in which the United States Attorney summed up to the jury. The appellations and examples which he applied to the defendants and to their acts fall just short of that degree of impropriety as would require a new trial. It is true that the summation of the defendants' counsel was such as to offer a temptation to rebut in kind but the prosecuting attorney should not have succumbed to such a temptation. Cases brought on behalf of the United States should be conducted with a dignity worthy of the client. This is particularly true where a jury is present and an individual is on trial on a criminal charge. It is the duty of the trial judge to make sure by the ample means at his disposal, whether citation for contempt or some less drastic expedient, that the trial is conducted with due propriety by both prosecutor and defense counsel.

---

hadn't happened still there should be no commission or kickback to an officer or director for procuring a loan. People should be able to walk into a bank and either get a loan on their security or if their security isn't good enough, they shouldn't get it, and there should be no deals made whereby the president of a bank sends prospective debtors, people wanting loans, to the vice president, who agrees that he will do something to get the loan in return for $2000, $800, $2600, or $23,000. It is important that this kind of thing not be done. It is against the law to do it, and it is against the law to do it whether you put up as security one of these certificates of deposit, whether you put up cash as security, whether you endorse a note as security, or whether you just pure use your influence. However, whatever technique or manner the officer or director uses to get that blood money, it is against the law, and it should be against the law."

4. The district judge who conducted this long trial so admirably had this to say

regarding it in his opinion denying a new trial:

"The remaining objections which we shall consider deal with the conduct of government counsel. Defendants contend they were thereby deprived of a fair trial. But we think the trial was conducted fairly, ably and with courtesy on both sides. There were some lapses from decorum but only such as were bound to crop up in a long, tiring trial such as this was. Government counsel did ask many leading questions as he is charged with doing but liberality was also shown to defense counsel. The subject matter of the evidence made leading questions unavoidable.

"The sharpest attack is made on the closing address of the United States Attorney. We do not intend to depart from the principle that statements of counsel not based on evidence which tend to influence the jury by an appeal to passion or prejudice will not be countenanced. However we have examined the record of the evidence and of the speech and conduct of government counsel and find no impropriety which justifies a new trial."