STATE OF CONNECTICUT *v.* DONALD COUTURE
(11294)

PETERS, HEALEY, PARSKEY, GRILLO and MENT, Js.

Argued May 9—decision released October 2, 1984

*John R. Williams,* for the appellant (defendant).

*Catherine J. Capuano,* special assistant state's attorney, and *Walter H. Scanlon,* acting state's attorney, with whom, on the brief, was *Francis M. McDonald,* state's attorney, for the appellee (state).

PARSKEY, J. After a trial to the jury, the defendant was convicted of three counts of murder and was sentenced by the court to three terms of imprisonment of twenty-five years to life, such sentences to run consecutively, for a total effective sentence of seventy-five years to life. In his appeal the defendant claims that his conviction was vitiated by (1) the denial of his motion

to suppress certain evidence seized in violation of his rights under the fourth amendment; (2) the composition of the grand jury and the conduct of its proceedings; (3) the court's unauthorized amendment of the indictment; and (4) the prejudicial summation of the prosecutor. The defendant also claims that the consecutive sentences which the court imposed were illegal.

The jury could reasonably have found the following facts. On the early morning of April 16, 1979, the police were called to the Purolator Armored Car garage in Waterbury where three guards, Leslie Clark, Edward Cody and William West, were found shot to death. Each body suffered multiple gunshot wounds, and the exterior and interior of the garage were littered with 24 expended 30 caliber shell casings fired from two M-1 semi-automatic carbines. The truck which Cody and West had driven from Hartford early that morning into the Waterbury garage where Clark was working alone was riddled with bullet holes, and its contents, a shipment of approximately 1.8 million dollars in cash, checks, food stamps and jewelry, were missing.

Late in the afternoon of April 16, 1979, Patricia Dolphin came to the police with information that she had purchased an Iver Johnson M-1 carbine, serial number AAO5518, at the request of Evelyn Vega for Lawrence Pelletier of Waterbury. Mrs. Dolphin related that Pelletier had been recently planning an armed robbery of the Purolator garage with a "Donald" whom Pelletier would talk to on the telephone. Mrs. Dolphin did not then know Donald's last name, but at the trial Mrs. Dolphin later identified Donald Couture as "Donald."

Acting on this information, the police sought a search warrant for the Waterbury home of Lawrence Pelletier to search for the murder weapons, other tools and the stolen armored car shipment. They also sought a war-

rant for Lawrence Pelletier's telephone toll records. The search warrants were issued very early on the morning of April 17 and they were executed shortly thereafter.

Found at Pelletier's home where Pelletier and Evelyn Vega lived were an attache case containing money, literature for a 30 caliber M-1 carbine and two expended shell casings ejected from the same M-1 carbine fired at the murder scene. The weapon itself and the robbery loot were not, however, at the Pelletier home.

The telephone toll record search revealed that Lawrence Pelletier often called a Donald Couture of Wallingford. On the basis of this and other information, during the early morning hours of April 17, 1979, the police sought a search warrant for Couture's premises in Wallingford. The search warrant was issued, and before dawn on the 17th the police entered the home of Donald Couture. There they found Donald Couture hiding under his bed. In the basement of that home were located the stolen armored car shipment, consisting of approximately $1,800,000 in cash, checks, food stamps, jewelry, empty deposit bags, and deposit slips made out by Purolator customers and a gun locker containing two 30 caliber M-1 carbines. Couture was later found to have the key to the gun cabinet on his key chain.

The two M-1's, one an Inland Marine model and the other the Iver Johnson, serial number AAO5518, bought for Pelletier, were examined and compared with expended cartridge cases and bullets found at the Purolator garage and with bullets recovered from the bodies and clothing of the slain guards. These latter bullets did not, as did other bullets, pass through the guards' bodies. Ten of the ejected cartridge cases at the murder scene came from the Iver Johnson carbine and fourteen had been ejected from the Inland Marine

carbine. Bullets from the bodies of all three victims had been fired from the Iver Johnson carbine and bullets from the bodies of Leslie Clark and Edward Cody had been fired from the Inland Marine weapon. Six bullet jacket fragments and one bullet fired from the Inland Marine weapon were also found at the Purolator garage, as well as two such fragments fired from the Iver Johnson carbine. These bullets and fragments were bloody.

On April 12, 1979, the Inland Marine M-1 carbine had been purchased under a fictitious name from the North Haven Gun Company by Donna Couture as a gift for her husband, the defendant. On April 13, Pelletier and Donald Couture were seen going into the woods near Wallingford and a great number of shots were heard in those woods. A bullet and seven expended cartridge cases recovered from the woods were found to have been fired from the Iver Johnson and one such expended cartridge case was found to have been ejected from the Inland Marine M-1 carbine.

A pair of Hit 800 bolt cutters was also found in the defendant's gun locker. These cutters had been used to cut a Page metal fence surrounding the Purolator garage to allow entry into the area. These same cutters had previously been borrowed from a Waterbury neighbor of Lawrence Pelletier by Pelletier's son. Found in Couture's basement gun locker were also two ski masks with the eye openings narrowed by thread which Pelletier's girlfriend, Evelyn Vega, had prepared for the robbery, as well as trousers recognized as Pelletier's. In Couture's gun locker the police also found an attache case, of the same type as the one found in Pelletier's house, filled with money. A footlocker was also found in Couture's basement together with store boxes for the two attache cases. All three pieces of luggage had been purchased by Pelletier and Vega on April 16.

The jury heard evidence that when the police found the money in Couture's home one officer stated: "We found the money," at which time the defendant stated: "Anybody could have put it in the basement,"although no one had stated where the money had been found.

Donald Couture's defense consisted of cross-examination of the state's witnesses and the presentation of three defense witnesses. One defense witness was Hurlburt Dolphin, a brother-in-law of Patricia Dolphin, who attacked the credibility of Patricia Dolphin and stated Mrs. Dolphin once asked him for firearms. A second defense witness was Barbara Ranando of the Colonial Bank and Trust Company who identified a bank deposit bag found with the robbery loot as a Colonial Bank deposit bag given in 1975 to Richard Demonte, the last Couture witness. Demonte testified he had been a partner of the defendant, Donald Couture in a luncheonette business which closed in 1975.

I

SEIZURE OF EVIDENCE

On April 16, 1979, three guards of Purolator Security, Inc., were murdered and over 1.7 million dollars worth of U.S. currency, jewelry and other items were stolen in an armed robbery at the Purolator Security (Purolator) building at 20 Dunbar Lane, Waterbury. On April 17, 1979, pursuant to a search warrant issued by Judge Henebry, law enforcement authorities entered the defendant's residence at 227 Hall Avenue in Wallingford and seized, inter alia, two M-1 carbine rifles and seven bags of currency containing more than $800,000. The defendant challenges the seizure on the grounds that (1) there was insufficient probable cause for the issuance of the search warrant and (2) the currency was not properly seized under the plain view doctrine. We disagree.

## A

### PROBABLE CAUSE TO SEARCH

"Under existing law, valid warrants may be issued to search *any* property . . . at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." (Emphasis in original.) *Zurcher* v. *Stanford Daily,* 436 U.S. 547, 554, 98 S. Ct. 1970, 56 L. Ed. 2d 525, reh. denied, 439 U.S. 885, 99 S. Ct. 231, 58 L. Ed. 2d 200 (1978). Whether there is probable cause is to be determined upon facts stated in the affidavit purporting to establish grounds for issuing the warrant. *United States* v. *Harris,* 403 U.S. 573, 579, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971); *State* v. *DeChamplain,* 179 Conn. 522, 530, 427 A.2d 1338 (1980). In considering the sufficiency of the affidavit we confine ourselves to the facts which appear on the face of the affidavit or which properly may be inferred therefrom; *State* v. *Williams,* 170 Conn. 618, 629, 368 A.2d 140, cert. denied, 429 U.S. 865, 97 S. Ct. 174, 50 L. Ed. 2d 145 (1976); testing those facts with common sense and reality; *United States* v. *Ventresca,* 380 U.S. 102, 108, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965); and with great deference to the fact that the issuing magistrate did determine that probable cause existed. *Jones* v. *United States,* 362 U.S. 257, 270–71, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960). The limited issue in the present case is whether it was reasonable to infer from the facts appearing in the affidavit that the weapons which were used in the robbery and murder at Purolator would be found at the defendant's residence.

When a warrant is sought to search specific premises for certain objects the information appearing in the affidavit should demonstrate a nexus between the objects to be seized and the premises to be searched. *United States* v. *Charest,* 602 F.2d 1015, 1017 (1st Cir.

1979). That nexus "[does] not have to rest on direct observation, but can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide a [weapon] used in the commission of a murder." Id.; see *United States* v. *Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970); *Mills* v. *State,* 278 Md. 262, 363 A.2d 491 (1976); *Bollinger* v. *State,* 556 P.2d 1035 (Okla. Crim. App. 1976).

The affidavit[1] stated that on April 16, 1979, a murder and robbery occurred at the Purolator Security office in Waterbury and about 1.7 million dollars and

---

[1] "AFFIDAVIT AND APPLICATION
SEARCH AND SEIZURE WARRANT
TO: A JUDGE OF THE SUPERIOR COURT
"The undersigned, being duly sworn, complains on oath that the undersigned has probable cause to believe that certain property, to wit: .30 caliber M1 carbine rifle Serial # AAo5518 or bearing another or no serial #, magazines for said M1 carbine rifle, ammunition for said M1 Carbine rifle, spent cartridge case or cases for said M1 Carbine rifle, spent projectiles for said M1 carbine rifle, hacksaws, wrenches, wire cutters and fingerprints of Donald Couture. 1973 Cadillac HT color grey, Ct. Reg. UG-1799; 1973 GMC pick up color green Ct. Reg. CW3105: 1970 Mercury HT color black Ct. Reg. VG-3794 is possessed, controlled, designed or intended for use as a means of committing the crime of Murder and Robbery in the first degree and which constitutes evidence that Donald Couture participated in the crime of murder and robbery in the first degree. is or has been or may be used as the means of committing said crimes of Murder and robbery in the first degree. Sums of United States currency, jewelry, food stamps, cancelled checks, checks, containers and or envelopes for said currency, jewelry, food stamps, cancelled checks, checks, which aggregated 1.7 million dollars.
were stolen from Purolator Security, Inc., 20 Dunbar Lane, Waterbury, Ct., on or about April 16, 1979.
and is within or upon a certain person, place or thing, to wit—Donald Couture and his premises at 227 Hall Avenue, Wallingford, Ct., including all out buildings, garages, garbage areas, attic and basement and a 1973 Cadillac HT color grey bearing Ct. Reg. UG-1799; a 1973 GMC pickup color green bearing Ct. Reg. CW-3105; and a 1970 Mercury HT color black bearing Ct. Reg. UG-3794 which is registered to Donna Couture and the premises of Donald Couture at 39 Martin St., Wallingford, Ct., including all buildings.
and that the facts establishing the grounds for issuing a Search and Seizure Warrant are the following:

other items were stolen. It further stated that on that same day Patricia Dolphin, a friend of Evelyn Pelletier, the live-in girl friend of Lawrence Pelletier, related to the affiant in specific detail that the defendant and Lawrence Pelletier planned, cased and participated in the Purolator robbery, that they had gained access to the Purolator garage building using wire and bolt cutters, and that Pelletier borrowed the wire cutters from a neighbor and stated to Dolphin that the cutters were

"1. That on April 16, 1979 three guards of Purolator Security, Inc., were murdered and over 1.7 million dollars worth of U.S. Currency, jewelry, food stamps, cancelled checks and or checks were stolen in an armed robbery at the Purolator Security armored garage at 20 Dunbar Lane, Waterbury, Ct. The crime scene was observed by the affiants, C. I. Griffin, a Waterbury Police Officer directing the investigation and Special Agent Raymond Looney of the F.B.I. coordinator with the F.B.I. Waterbury Police investigation.

"2. That on April 16, 1979 Patricia Campbell Dolphin came to the police and related the following information to the affiants:

"3. That Mrs. Dolphin stated that she is a friend of Evelyn Pelletier aka Evelyn Vega, who is the girlfriend of Lawrence J. Pelletier of 23 Carmen St., Waterbury, Ct., lives with him and in whose name a 1970 Dodge automobile bearing Ct. Reg. WS-1109 is registered and which vehicle said Pelletier uses. A vehicle being green with black top was observed by Det. Bouley at the premises on 4-16-79. It was used by Pelletier.

"4. That Mrs. Dolphin stated that she (Mrs. Dolphin) purchased an M1 carbine rifle bearing S.N.AAO5518, in Meriden for said Pelletier on April 7, 1979, at Evelyn Pelletier aka Evelyn Vega's request. Such a weapon according to James E. McDonald, a forensic criminalistics and ballistic expert, who examined the crime scene and removed spent cartridge cases therefrom on April 16, 1979, was fired over 30 times at the scene where the three guards were victims of multiple and deadly gunshot wounds and the armored car was fired upon many times in said robbery. This information was given to said affiants by said McDonald.

"5. That within the past two weeks said Pelletier discussed with Evelyn Pelletier aka Evelyn Vega in the presence of Mrs. Dolphin that he was going to do a big job. On April 12, 1979 Evelyn Pelletier aka Evelyn Vega had pointed out a Purolator Security armored truck to Mrs. Dolphin as the job that was going to occur. Mrs. Dolphin so informed the affiants.

"6. That Mrs. Dolphin saw Pelletier also borrow a pair of wire cutters through his son from his neighbor to use in the job. At this time, Pelletier, stated in Mrs. Dolphin's presence that the cutters were needed to cut the fence for the job as they could not be seen climbing over the fence. Before Thursday, April 12, 1979, said Pelletier took said cutters out of the house

needed to cut the wires on the fence for the "job." It also stated that the type of weapon used in the murder of the three Purolator guards was an M-1 carbine rifle, that on April 7, 1979, Dolphin, at Evelyn Pelletier's request, purchased an M-1 carbine rifle which, according to a forensic ballistics expert had been used in the murder, and that spent shell casings from such rifle were found at the scene of the crime and matching casings were found, pursuant to a search warrant, at Pelletier's residence but that no carbine rifle was found there. The affidavit did not mention the recovery of any of the stolen money, but it did further state

at night and left with a loud sounding truck owned by Donald (last name unknown) and then returned to the house with the clippers where Mrs. Dolphin saw them on Saturday, April 14, 1979. On April 12, 1979, Mrs. Pelletier aka Mrs. Vega purchased two inch surgical tape to use to gag the guards for the job, but the tape would not hold as Mrs. Dolphin observed Mrs. Pelletier aka Mrs. Vega use the tape on Pelletier but it would not hold. Mrs. Dolphin observed this during the week of April 8, 1979 to April 14, 1979.

"7. That according to James McDonald, the high wire fence surrounding the Purolator Security Inc., garage where the crime occurred was cut in numerous places and chains and bolts also cut with a pair of wire cutting tools.

"8. That according to Evelyn Pelletier aka Evelyn Vega, who so informed Mrs. Dolphin the idea to commit the robbery arose during a breaking and entering of the Franco American Club adjoining the murder scene. Pelletier had cased the job and watched the place at night and Mrs. Dolphin heard Pelletier and Mrs. Pelletier aka Mrs. Vega discussing this and then Donald and Pelletier left the house every night for a week at 2 A.M. and returned at 5 A.M. in April, 1979. The job referred to in this paragraph is the big job that Pelletier was to do. That the Franco American Club was broken into and entered on March 5, 1979 according to police records.

"9. That the Franco American Club was broken into and entered on March 5, 1979 according to police records.

"10. That Pelletier in April 1979 had according to Mrs. Dolphin, test fired the carbine rifle in the basement of 23 Carmen St., Waterbury, Ct., as she had heard the and smelled the powder. Mrs. Dolphin purchased two clips for the weapon and ammunition for the same on April 7, 1979 in Meriden. She purchased one box of ammunition.

"11. That in the course of said robbery according to James E. McDonald, who reported same to the affiants, a hacksaw was used to cut an interior bolt securing a trap door in the Purolator garage which was forced open

that Pelletier, according to Dolphin, customarily uses a 1970 green Dodge with a black top, that this vehicle was observed by Detective Bouley at the Pelletier premises on the evening of April 16, 1979, and that the defendant, who had according to Dolphin participated with Pelletier in numerous crimes in the past, had no police record. The issuing magistrate, *Henebry, J.,* found that there was probable cause to believe that the items referred to in the affidavit would be found either on the person of the defendant or at his residence in Wallingford.

by the perpetrators, wrenches were used to remove the fence bolts to open the surrounding fence, cutters used to cut the fence, other bolts and fence chains.

"12. That Mrs. Dolphin also heard Pelletier and Mrs. Pelletier aka Mrs. Vega discussing the use of wire to tie up the guards, in April 1979.

"13. That on the evening of April 16, 1979, Det. Bouley observed the residence of Lawrence J. Pelletier at 23 Carmen St., Waterbury, Ct., and saw a green automobile with a black vinyl top, which according to Mrs. Dolphin is used by Pelletier.

"14. According to Mrs. Dolphin, as told to the affiants, Pellitier was actively engaged with Donald, last name unknown, a white male about 25 years old in planning the job and using Donald's truck to case the job. Donald, who had no record, according to Pellitieir to Mrs. Dolphin, had done many other crimes with Pellitier. Both would call each other over Pellitier's telephone, whose number, often called by Mrs. Dolphin, is Waterbury, 756-7335. Donald, Mrs. Dolphin related would often meet Pellitier in Cheshire.

"15. That on one night last week Mrs. Dolphin overheard Donald and Pelletier discussing the fact that they were so close to the building that they could hear the guards talking inside the building.

"16. The toll records of Pelletier's telephone number 756-7335 were examined under search warrant in the possession of S.N.E.T. Co. and revealed a great number of calls to 269-0495 listed to Donald and Donna Couture, 227 Hall Avenue, Wallingford, Ct. According to Mrs. Dolphin, the Donald referred to in this warrant had a wife named Donna and was in regular contact with Pelletier.

"17. That found at Pelletier's residence by the affiant C.I. Griffin and men under his direction were spent shell casings, bullets and a phamplet for an M1 carbine rifle. Pelletier's neighbor confirmed that he had lent Pelletier a pair of wire cutters. However the carbine, and the wire cutters were not located at Pelletier's residence.

"18. That a 1973 GMC green pick up Ct. Reg. CW-3105, a 1973 Cadillac HT color grey, Ct. Reg. VG-1799, are now registered to Donald Couture,

The crime occurred on April 16, 1979. The application and affidavit were submitted to the issuing magistrate in the very early hours of the next day. Included in the items stolen from Purolator were almost two million dollars of U.S. currency. With that huge amount

and a 1970 Mercury HT color black Ct. Reg. VG-3794 was until recently registered to Donna Couture. Said vehicles are registered to Donna and Donald Couture at 39 Martin St., Wallingford, Ct.

"19. That Mrs. Dolphin stated that during March 1979 she saw Donald Couture driving a Cadillac.

"20. That James McDonald a forensic criminalistics and ballistic expert stated that the shell casings recovered at the home of Pelletier matched the shell casings found at the scene of the Purolator Security Inc. armed robbery and murders which took place on or about April 16, 1979. McDonald stated this on April 17, 1979.

"21. That according to the records of S.N.E. T. Co. Donald Couture and Donna Couture have service as of this time at 227 Hall Ave., in Wallingford, Ct. 269-0495 and had a listing in the September 1977 telephone directory at 39 Martin Ave., Wallingford, Ct.

The undersigned has not presented this application in any other court or to any other judge.

Wherefore the undersigned prays that a warrant may issue commanding a proper officer to search said person or to enter into or upon said place or thing, search the same, and take into custody all such property.

"/s/ John Griffin Chief Insp.
Signed at Wtby., Conn. This 17 day of April, 1979.

"/s/ Raymond M. Looney, Special Agent, FBI, Wtby, Ct.
Signed at Wtby., Conn. This 17 day of April, 1979.

"JURAT
Subscribed and sworn before me this 17th day of April, 1979.

Signed a judge of Sup. Court
Henebry, J."

"SEARCH AND SEIZURE WARRANT

"STATE OF CONNECTICUT
SUPERIOR COURT

"The foregoing Affidavit and Application for Search and Seizure Warrant having been presented to and been considered by the undersigned, a Judge of the Superior Court, the undersigned (a) is satisfied therefrom that grounds exist for said application, and (b) finds that said Affidavit establishes grounds and probable cause for the undersigned to issue this Search and Seizure Warrrant, such probable cause being the following: From said Affidavit and the undersigned finds that there is probable cause for the

of money to secrete, the magistrate could infer that the perpetrators were faced with the elephant dilemma (where do you hide an elephant?). An earlier search of the Pelletier residence uncovered neither the weapon

undersigned to believe that the property described in the foregoing Affidavit and Application is within or upon the person, if any, named or described in the foregoing Affidavit and Application, or the place or thing, if any, named or described in the foregoing Affidavit and Application, under the conditions and circumstances set forth in the foregoing Affidavit and Application, and that, therefore, a Search and Seizure Warrant should issue for said property.

"NOW THEREFORE, by Authority of the State of Connecticut, I hereby command any Police Officer of a regularly organized police department or any State Policeman to whom these presents shall come within a reasonable time after the date of this warrant to

Enter into or upon and search the place or thing described in the foregoing affidavit and application, to wit: premises at 227 Hall Avenue, Wallingford, Ct., including all out buildings, garages, garbage areas, attic and basement and a 1973 Cadillac HT color grey bearing Ct. Reg. UG-1799; a 1973 GMC pickup colo- green bearing Ct. Reg. CW-3105; and a 1970 Mercury HT color black bearing Ct. Reg. UG-3794 which is registered to Donna Couture and the premises of Donald Couture at 39 Martin St., Wallingford, Ct., including all buildings.

Search the person described in the foregoing Affidavit and application, to wit: Donald Couture

for the property described in the foregoing Affidavit and Application, to wit: .30 caliber M1 carbine rifle Serial #AA05518 or bearing another or no serial #, magazines for said M1 carbine rifle, ammunition for said M1 Carbine rifle, spent cartridge case or cases for said M1 carbine rifle, spent projectiles for said M1 carbine rifle, hacksaws, wrenches, wire cutters and fingerprints of Donald Couture. 1973 Cadillac HT color grey, Ct. Reg. UG-1799; 1973 GMC pick up color green Ct. Reg. CW3105; 1970 Mercury HT color black Ct. Reg. VG-3794 and upon finding said property to seize the same, take and keep it in custody until the further order of the court, and with reasonable promptness make due return of this warrant accompanied by a written inventory of all property seized.

"SIGNED AT Waterbury, Connecticut, This 17th day of April, 1979.

/s/ Henebry, J.
A JUDGE OF THE SUPERIOR COURT"

"APPLICATION TO DISPENSE WITH REQUIREMENTS OF P.A. 76-155.

"RE: SEARCH WARRANT APPLICATION DATED 4-17-79 FOR A CERTAIN PERSON, PLACE OR THING TO WIT . . . . person of

nor the huge amount of stolen money. That the search warrant, for whatever reason, did not authorize a search for the money does not mean that the magistrate could not utilize the information and inferences respecting the money in drawing an inference concerning the likely location of the murder weapon. In these circumstances it was reasonable for the issuing magistrate to infer that the money, because of its bulk and because of the time constraints, would likely be stored at a convenient "safe" house. *United States* v. *Lucarz*, supra. It is also a logical inference that a criminal who believes his identity is concealed would utilize his residence as such a safe place; *Bollinger* v. *State*, supra, 1039; not only for storage of the loot but also as a temporary depository for the weapon used in the crime. The magistrate could consider that the defendant had

Donald Couture, Cadillac bearing Ct. Reg. VG-1799, 1973 GMC pick up green Ct. Reg. CW-3105, 1970 Mercury black Ct. Reg. VG-3794, premises at 227 Hall Ave., and 39 Martin St., Wallingford, Ct.

"THE UNDERSIGNED HEREBY REQUESTS THAT THE REQUIREMENT, PURSUANT TO P.A. 76-155, CONCERNING THE DELIVERY OF APPLICATIONS FOR AND AFFIDAVITS IN SUPPORT OF A SEARCH WARRANT BE DISPENSED WITH FOR THE FOLLOWING REASON(S):

"THE PERSONAL SAFETY OF A CONFIDENTIAL INFORMANT WOULD BE JEOPARDIZED BY THE GIVING OF A COPY OF THE AFFIDAVITS AT SUCH TIME.

"THE SEARCH IS PART OF A CONTINUING INVESTIGATION WHICH WOULD BE ADVERSELY AFFECTED BY THE GIVING OF A COPY OF THE AFFIDAVITS AT SUCH TIME.

"THE GIVING OF SUCH AFFIDAVITS AT SUCH TIME WOULD REQUIRE DISCLOSURE OF INFORMATION OR MATERIAL PROHIBITED FROM BEING DISCLOSED BY CHAPTER 959a.

"SIGNED /s/ John Griffin C. Insp.
/s/ Raymond M. Looney
Special Agent, FBI"

"4/17/79
"THE FOREGOING APPLICATION IS GRANTED
JFH

"/s/ Henebry, J.
JUDGE"

no reason to suspect that, at that early stage, the investigative probe would move in his direction. He had participated with Pelletier in other crimes in the past and had remained unscathed. Although with the passage of time the situation might change; *United States* v. *Charest,* supra, 1018; at the time of the issuance of the warrant it was reasonable for the magistrate to infer that the defendant's residence was the logical place to conceal not only the fruits but also the instrumentalities of the crime. 1 LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 3.7, p. 709. "In considering the situation realistically, the logical inference is that a criminal, who believes his identity has been concealed, would return [the weapon] and property to his home. Such an inference is not certainty, but a certainty is not required. And, we are of the opinion that, at the least, a probability existed that the property sought was indeed at the residence of the defendant." *Bollinger* v. *State,* supra, 1039.

*State* v. *DeChamplain,* supra, does not require a different result. In that case, we held that the affidavit was insufficient to support a finding of probable cause that marihuana was located in the defendant's apartment. There the affidavit revealed that a drug transaction was arranged over the phone located in the apartment. The police then observed the defendant leave the building in which the apartment was located, enter a car parked near the building, drive directly to the designated meeting place and consummate the transaction. Id., 524–25. The affidavit did not state whether, when the defendant left the apartment building, he was carrying a package. Id., 532. We concluded that these observations of activity around the building did not sufficiently support the conclusion that there was probable cause to believe that there was marihuana in the apartment. Id., 530.

In *DeChamplain* there was not enough evidence connecting the marihuana with the apartment. In the present case the affidavit contained substantial facts from which the magistrate could conclude that there was probable cause to believe the weapon was located in the defendant's house. The magistrate knew from the affidavit that a search of Pelletier's house had not revealed the money or the weapon. He also knew that the amount of money was substantial and hence not easily disposed of. Further, the magistrate knew that the defendant had no criminal record. From this the magistrate could reasonably infer that the defendant believed his identity was unknown and that his house was at least temporarily a secure place in which to store the money. These reasonable inferences would have sufficed to establish probable cause to believe that the money would be found at the defendant's home. In contradistinction to *DeChamplain,* therefore, the defendant's residence was factually implicated in the defendant's criminal activity.

The affidavit also disclosed that the murder weapon was recently purchased and bore a serial number which made it easily traceable to Pelletier. The magistrate could reasonably infer that the defendant would have an interest in secreting this weapon or dismantling it, before it could be associated with the defendant. The magistrate was aware that all of this had to be accomplished in the relatively short period of time that had elapsed since the crime, and in a safe place. It was reasonable for the magistrate to conclude that, if the defendant believed that his house was a safe place for the money, it was also a safe place temporarily to hide the weapon. "Where the object of the search is a weapon used in the crime . . . the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator

is unaware that the victim has been able to identify him to the police." 1 LaFave, Search and Seizure, supra.

In reviewing the sufficiency of an affidavit for a search warrant we do not conduct a de novo review. *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983). Rather, the traditional standard of review is whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. Id. In considering the quantum of certainty required, it is only a probability, and not a prima facie showing of criminal activity, that is the standard of probable cause. *United States* v. *Travisano,* 724 F.2d 341, 346 (2d Cir. 1983). If there is a fair probability that the premises to be searched will yield the objects specified in the search warrant, the fourth amendment has been satisfied even where many localities were available to the guilty parties to secrete the fruits and instrumentalities of the crime. Id. Applying these standards, we agree with the trial court that there was a substantial basis for the issuing magistrate to conclude that the weapon used in the murder would be found at the defendant's residence.[2]

## B

### SEIZURE OF MONEY – PLAIN VIEW

Given the lawful entry of the police into the defendant's residence pursuant to a valid search warrant the next question is whether they were justified in seizing the money which was observed in a number of trans-

---

[2] Because of our holding that the warrant was supported by probable cause, we need not decide whether the good faith exception to the exclusionary rule, recently announced in *United States* v. *Leon,* 468 U.S.    , 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), is applicable to this case. "For the same reason, we need not decide whether the modification of the exclusionary rule made by *Leon* would sufficiently uphold the rights guaranteed by article first, § 7 of the Connecticut constitution." *State* v. *Delmonaco,* 194 Conn. 331, 334 n.4, 481 A.2d 40 (1984).

parent bags. The defendant argues that under *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971), the police could seize under the plain view doctrine only articles which they came upon inadvertently and that the money was not in that category, since in their application they sought permission to search for the money but that the warrant contained no such authority. While it is true that seizure of items in plain view is limited to those items which police come upon inadvertently, inadvertence is not required if the items seized fall under the category of contraband, stolen property or objects dangerous in themselves. See *Coolidge* v. *New Hampshire,* supra, 466; *United States* v. *Liberti,* 616 F.2d 34, 38 (2d Cir. 1980) (Newman, J., concurring); *State* v. *Gold,* 180 Conn. 619, 649, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). The seizure of the seven bags of U.S. currency was valid.

## II

On August 29, 1979, the defendant filed an omnibus motion to dismiss the indictment which challenged, inter alia, (1) the underrepresentation of certain groups on Waterbury grand juries;[3] (2) the presence and par-

[3] The defendant also contended that the exclusion of blacks and women from the positions of grand jury foreperson and grand jury attorney was unconstitutional. We do not reach these claims.

With respect to the foreperson challenge, the United States Supreme Court has recently rejected this claim. In *Hobby* v. *United States,* 468 U.S. , 104 S. Ct. 3093, 3097, 82 L. Ed. 2d 260 (1984), the court held: "No one person can possibly represent all the 'qualities of human nature and varieties of human experience,' [*Peters* v. *Kiff,* 407 U.S. 493, 503, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972)], that may be present in a given community. So long as the composition of the federal grand jury *as a whole* serves the representational due process values expressed in *Peters,* discrimination in the appointment of one member of the grand jury to serve as its foreman does not conflict with those interests." (Emphasis in original.) Accordingly, this claim is not cognizable.

With respect to the attorney member challenge, the reasoning in *Hobby* applies with equal force to this claim. We do not believe that this claim should be considered apart from the challenge to the entire grand jury.

ticipation of unauthorized persons in the grand jury proceedings; and (3) the withholding of allegedly exculpatory evidence from the grand jury. The trial court, *Pickett, J.*, denied the motion and the defendant assigns this as error.

## A

### CHALLENGE TO GRAND JURY ARRAY

The defendant claims that the underrepresentation of Hispanics[4] on grand juries in the judicial district of Waterbury violated his rights to equal protection and due process as provided by the fourteenth amendment to the United States constitution and as a result the indictment should have been dismissed. In support of his claim the defendant presented the following relevant evidence. During the period of January 1, 1973, until June 6, 1979, the date of the defendant's indictment, there were thirty-four grand juries in the judicial district of Waterbury. Of the 612 grand jurors composing the array, only six or .98 percent were Hispanic. The Hispanic population during the relevant period constituted 4.5 percent of the population of the judicial district of Waterbury.[5]

The trial court, in an exhaustive memorandum of decision, held that since the defendant was not Hispanic he had no standing to raise an equal protection challenge. It further concluded that the defendant could not raise a due process challenge because the sixth amendment requirement that state juries reflect a fair cross-section of the community was inapplicable to state grand juries. The court reasoned that unlike the sixth amendment, the grand jury provisions of the fifth

---

[4] The defendant's claims of underrepresentation of other groups, not having been briefed, are considered abandoned. *Kiniry* v. *Danbury Hospital*, 183 Conn. 448, 449, 439 A.2d 408 (1981).

[5] Prior to the hearing, the state and the defendant stipulated to the number of grand juries and the estimate of the Hispanic population. The evidence of the number of Hispanics who actually served was not contested.

amendment have not been made applicable to the states by the due process clause; *Hurtado* v. *California,* 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884); and therefore any right to a representative grand jury applies only to federal grand juries. Consequently, the court did not reach the issue of whether the disparity between the percentage of Hispanics in the population and their representation on the array was constitutionally significant.

We agree with the trial court that the defendant's equal protection claim is not cognizable. It is well settled that in order to bring such a challenge, the defendant must be a member of the underrepresented class. *Castaneda* v. *Partida,* 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). We do not agree, however, that the defendant is precluded from raising a due process challenge.

Although a state is not required to utilize a grand jury as part of its criminal justice system, when it chooses to do so it must "hew to federal constitutional criteria." *Carter* v. *Jury Commission of Greene County, Alabama,* 396 U.S. 320, 330, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970); *Cobbs* v. *Robinson,* 528 F.2d 1331, 1334 (2d Cir. 1975), cert. denied, 424 U.S. 947, 96 S. Ct. 1419, 47 L. Ed. 2d 354 (1976); *State* v. *Cobbs,* 164 Conn. 402, 407, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973). In *Peters* v. *Kiff,* 407 U.S. 493, 502, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (plurality opinion), the court recognized a due process challenge to a state grand jury, without requiring the defendant to be a member of the underrepresented class. "[A] [s]tate cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole

judicial process." Though this holding commanded only three votes,[6] it has never been overruled. Indeed, its vitality has most recently been affirmed in *Hobby* v. *United States,* 468 U.S. , 104 S. Ct. 3093, 3097, 82 L. Ed. 2d 260 (1984).

This court has implicitly acknowledged the applicability of the due process clause to the selection of the grand jury. Just this term in *State* v. *Castonguay,* 194 Conn. 416, 481 A.2d 56 (1984), we exhaustively considered the defendant's due process challenge to the composition of the grand jury. Previously, in *State* v. *Cobbs,* supra, 407–11, we discussed the defendant's claim that the grand jury was not drawn from a fair cross-section of the community. See also *State* v. *Reinosa,* 29 Conn. Sup. 117, 274 A.2d 452 (1970).

We recognize that there is some authority for the trial court's position. See, e.g., *Castaneda* v. *Partida,* supra, 509 (Powell, J., dissenting); *Villafane* v. *Manson,* 504 F. Sup. 78, 82 n.6 (D. Conn.), aff'd without opinion, 639 F.2d 770 (2d Cir. 1980);[7] *State* v. *Acosta,* 125 Ariz. 146, 608 P.2d 83 (1980); *Commonwealth* v. *Bastarache,* 414 N.E.2d 984 (Mass. 1980). The clear weight of authority is, however, to the contrary. See, e.g., *Obregon* v.

---

[6] Three justices relied on 18 U.S.C. § 243 which imposes criminal penalties for racial discrimination in the selection of grand or petit jurors. *Peters* v. *Kiff,* 407 U.S. 493, 505–507, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (White, J., concurring).

[7] *Villafane* v. *Manson,* 504 F. Sup. 78 (D. Conn.), aff'd without opinion, 639 F.2d 770 (2d Cir. 1980), was an equal protection challenge to a grand jury array. Thus the statement in footnote 6 that "[a] challenge to the composition of state grand juries, unlike a challenge to the petit jury, involves only the fourteenth amendment equal protection clause. No fifth or sixth amendment due process considerations are invoked," is dicta. The validity of this dicta is questionable since the second circuit has analyzed a due process challenge to a state grand jury. See *Cobbs* v. *Robinson,* 528 F.2d 1331 (2d Cir. 1975), cert. denied, 424 U.S. 947, 96 S. Ct. 1419, 47 L. Ed. 2d 354 (1976).

*United States,* 423 A.2d 200 (D.C. App. 1980), cert. denied, 452 U.S. 918, 101 S. Ct. 3054, 69 L. Ed. 2d 422 (1981); *Colvin* v. *Commonwealth,* 570 S.W.2d 281 (Ky. 1978); *State* v. *Lawrence,* 351 So. 2d 493 (La. 1977); *Adler* v. *State,* 594 P.2d 725 (Nev. 1979); *State* v. *Porro,* 158 N.J. Super. 269, 385 A.2d 1258 (1978); *People* v. *Guzman,* 60 N.Y.2d 403, 409 n.3, 457 N.E.2d 1143, 469 N.Y.S.2d 916 (1983), cert. denied, 466 U.S. 951, 104 S. Ct. 2155, 80 L. Ed. 2d 541 (1984); *State* v. *Bowen,* 45 Or. App. 17, 607 P.2d 218 (1980); *State* v. *Jenison,* 405 A.2d 3 (R.I. 1979); *Post* v. *State,* 580 S.W.2d 801 (Tenn. Crim. App. 1979). We hold that the defendant's due process challenge to the composition of the grand jury is cognizable. Accordingly, we will consider the merits of that claim.

In *State* v. *Castonguay,* 194 Conn. 416, 421–22, 481 A.2d 56 (1984), we set out the proper analysis for a fair cross-section challenge: " 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' *Duren* v. *Missouri,* [439 U.S. 357], 364, [99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)]. Once the defendant has established this prima facie case, the burden then shifts to the state to prove that the selection system resulting in a nonrepresentative array furthers a significant state interest. Id., 367."

It is beyond dispute that Hispanics constitute a distinct group in the community. Id., 424; *State* v. *Villafane,* 164 Conn. 637, 325 A.2d 251 (1973). The defendant has satisfied this element of his burden of proof.

It is in the second element, proof of substantial under-representation; *State* v. *Castonguay,* supra, 425–26; *State* v. *Haskins,* 188 Conn. 432, 440, 450 A.2d 828 (1982); that the defendant fails. In *Castonguay,* supra, 427–30, we examined various methods used to describe and evaluate underrepresentation. We concluded that in a due process challenge where the distinct group constitutes a small percentage of the population in the community, the most accurate method is the substantial impact test. "Its focus is not on numbers and percentages but rather on whether the underrepresentation substantially affects the composition of the grand jury." Id., 430. When we apply that method to this case, the defendant cannot prevail.

The grand jury array during the relevant period was composed of 612 grand jurors. If the array reflected the number of Hispanics in the judicial district (4.5 percent), it should have included approximately twenty-eight Hispanics (4.5 percent of 612). The array included six Hispanics. Hispanics were therefore underrepresented by almost twenty-two grand jurors. In substantial impact terms, slightly more than one Hispanic should have been included on every other grand jury. Since "only 'gross' or 'marked' disparities or 'substantial' departures from a 'fair cross section' require judicial intervention"; *United States* v. *Test,* 550 F.2d 577, 590 (10th Cir. 1976); we cannot conclude that this underrepresentation is constitutionally significant. Cf. *State* v. *Castonguay,* supra, 430–31.

## B

### PRESENCE AND CONDUCT OF UNAUTHORIZED PERSONS BEFORE THE GRAND JURY

During the course of the grand jury proceedings, counsel for the defendant and counsel for his codefendant Lawrence Pelletier requested the trial court's permission to accompany their clients in the grand jury room

during the taking of testimony. The court ruled that any of the accused called as a witness had the right to an attorney's presence during the time he or she was testifying, but none of the defendant's attorneys would otherwise be permitted to attend the proceedings. The court explicitly instructed the grand jury: "In the event that any of the accused is called as a witness, your foreman or forelady shall instruct that person that he or she has a right to remain silent, right to consult and have an attorney present and a right to stop answering any questions at any time without giving any reason . . . . If an attorney is present, he shall not participate in the questioning but rather be present for the sole purpose of conferring with his or her client. When the witness has finished testifying counsel shall be excused from the Grand Jury room." The defendant did not object to this instruction.

Since the defendant did not testify, his counsel was not present in the grand jury room at any time. His codefendants Evelyn Vega and Donna Couture did testify, however, and their respective attorneys, David Rosen and Hugh Keefe, were permitted by the court to be present during their testimony. The defendant, whose counsel was present when permission was granted, did not object. In disregard of the trial court's express instructions, both counsel participated in the questioning of their clients. The defendant claims that the attorneys' presence and conduct require dismissal of the indictment.

The first aspect of the defendant's claim is addressed to the trial court's action in authorizing the attorneys' presence. The defendant urges us to adopt a per se rule similar to that in the federal courts; see, e.g., *United States* v. *Phillips Petroleum Co.*, 435 F. Sup. 610, 618 (N.D. Okla. 1977), and cases cited therein; and hold that the presence of any unauthorized person in the grand jury room vitiates the indictment. The defendant has

failed to preserve properly this claim for appeal. Though he had ample opportunity to do so, at no time did the defendant object to the trial court's decision to permit the attorneys' presence. Practice Book § 288.

The issue of who is authorized to be present in the grand jury room is a matter of practice embodied in Practice Book § 609.[8] It does not implicate a fundamental constitutional right. Consequently, the defendant, having failed to object below, cannot claim error on appeal. See Practice Book § 3063.

Nor can we consider the second aspect of the defendant's claim, that the attorneys, in disregard of the trial court's instructions, elicited testimony from their clients. In support of his claim that he was prejudiced by this questioning the defendant relied on the transcript of the grand jury proceedings.[9] This he cannot do.

At the time of the offense, General Statutes (Rev. to 1979) § 54-45a limited the evidentiary use of the grand jury transcript in any proceeding against the accused to "impeaching a witness, attacking the credibility of a witness or proving inconsistent statements of a witness. Such transcript may also be used as evidence in a prosecution for perjury committed by a witness while giving such testimony." In *State* v. *Canady,*

---

[8] Practice Book § 609 provides:

"Sec. 609. ——WHO MAY BE PRESENT

"The following persons may be present while the grand jury is hearing evidence:

"(1) The witness under examination;

"(2) Interpreters when needed;

"(3) Such security personnel as the judicial authority shall deem necessary;

"(4) The defendant, within the discretion of the judicial authority; and

"(5) A court reporter.

No persons other than the jurors may be present while the grand jury is deliberating or voting."

[9] At the hearing on the motion to dismiss, Attorney Rosen conceded that he questioned his client but was precluded from testifying to the substance of that questioning.

187 Conn. 281, 287, 445 A.2d 895 (1982), we construed the substance[10] of this statute strictly and concluded that a defendant may not prevail on claims of error that depend on the unauthorized use of the grand jury transcript. Because the defendant's use of the grand jury transcript is not authorized by the statute we cannot consider this claim.[11]

## C

### EVIDENCE NOT PRESENTED TO THE GRAND JURY

The state and the defendant have stipulated that certain information[12] was withheld from the grand jury. The defendant claims that it was exculpatory and that because it was withheld from the grand jury his indictment should be dismissed. There is no merit to this claim.

---

[10] In Public Acts 1980, No. 80–313, § 4, General Statutes § 54-45a was amended. The provision discussed above was unchanged however. See General Statutes (Rev. to 1981) § 54-45a (b).

[11] Even if the defendant attempted to press his claim without relying on the transcript, we would find no error in the face of all the evidence before the grand jury that inculpated the defendant. We could hardly say that it was the testimony elicited by Donna Couture's and Evelyn Vega's attorneys that led to the grand jury's conclusion that the defendant should stand trial.

[12] "13. The State's Attorney's Office had information as follows in its files or in police files at the time of the Grand Jury hearing:

"A. No latent fingerprints of Donald Couture or Lawrence Pelletier were developed at the scene of the murders.

"B. At the time she testified, Patricia Dolphin was receiving subsistence payments from the United States Government and had been relocated at Government expense under the witness protection program.

"C. I. Before any statement was taken from Donna Couture and before she appeared as a witness before the Grand Jury, the State made the following statement to Mrs. Couture and her attorney:

"*Mr. McDonald:* 'In this matter, the matter of Donna Couture, Mr. Keefe and Mrs. Couture are here present and before any statement is taken the State's Attorney's Office states that we do not at this time seek a capital felony indictment for the June 4, 1979 Grand Jury. We will, however, seek a felony murder indictment as described in Counts four, five and six of the proposed indictment.

"If cooperation, and by that we mean one hundred percent cooperation,

Since the grand jury does not consider the guilt or innocence of the accused but only determines whether he or she should stand trial, the accused "is not allowed to testify or to introduce evidence tending to prove his innocence except insofar as his questioning of the state's witnesses may disclose the weakness of the state's case." *State* v. *Menillo,* 159 Conn. 264, 274–75, 268 A.2d 667 (1970); *State* v. *Stepney,* 181 Conn. 268, 274, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981). The purpose of the grand jury is not to duplicate the trial but rather to satisfy itself that "there is probable cause to believe that the accused is in danger of conviction of [the crime charged]." *State* v. *Menillo,* supra, 275.

is received, we will bring this matter to the attention of the sentencing judge if Mrs. Couture wishes us to do so and if she is at any time sentenced for any criminal involvement with respect to this case.'

"II. Before any statement was taken from Evelyn Vega and before she appeared as a witness before the Grand Jury, the State made the following statement to Mrs. Vega and her attorney:

*"Mr. McDonald:* 'Miss Vega is here with her lawyers, Mr. Rosen and Miss MacKinnon, and we are stating that we are agreeing not to seek a capital felony indictment at the June 4, 1979, session of the Grand Jury with respect to this case. We will, however, seek the felony murder indictment against Miss Vega and others as set forth in Counts four, five and six of the proposed indictment.

" 'If cooperation is received, and that is one hundred percent cooperation, we will bring that to the attention of the sentencing judge, should Miss Vega be brought before a judge for sentencing in connection with her conduct in this case.

" 'If there is this type of cooperation, of course, we will not oppose an application for reasonable bail.

" 'Our agreement not to seek the capital felony count applies to Evelyn Vega and Donna Couture only. That is the sole consideration and agreement entered into between the State and Miss Vega at this time.'

"D. The witness Patricia Dolphin had, previous to her testimony, described the person she identified as Donald Couture before the Grand Jury as having blond curly hair.

"E. Mary Haseronck, a former employee of Purolator, had informed the police that two former Purolator employees were users of narcotics and she suspected them of the crimes.

"F. Robert Stokes of Wallingford confessed to participating in the crimes subject of the indictments."

The Connecticut grand jury system is almost unique in that the state's role in the proceedings is minimal. The state's attorney is not permitted in the grand jury room and his task is confined to submitting to the grand jury a list of witnesses who he believes will testify in support of the indictment. The grand jury is not at all bound by this list. Id., 276; see *Lung's Case,* 1 Conn. 428 (1815); Practice Book § 614. The defendant, with the court's permission, is allowed in the room during the presentation of evidence; Practice Book § 609; and can question the witnesses. Thus, unlike in the federal system and in other states, the grand jury is not dependent on the state's attorney for both advice and information. See, e.g., *United States* v. *Ciambrone,* 601 F.2d 616, 622 (2d Cir. 1979); *Frink* v. *State,* 597 P.2d 154 (Alaska 1979). Consequently, in the absence of a request by the grand jury, the state is not obligated to present the grand jury with every piece of relevant information.

We do believe, however, that since the state has no interest in accusing the wrong person, it is obliged to present the grand jury with any substantial evidence that would negate the accused's guilt, that is evidence which "might reasonably be expected to lead the jury not to indict." *United States* v. *Ciambrone,* supra, 623. It is unnecessary for us to discuss each piece of information contained in the stipulation. Suffice it to say that we have examined the information and conclude that none of it would have precluded a finding of probable cause. We find no error.

## III

### "AMENDMENT" TO INDICTMENT

The defendant asserts that the trial court impermissibly amended the indictments contained in counts five and six and therefore the defendant's convictions on these counts should be reversed and these indictments

should be dismissed. Count five[13] initially charged the defendant both with intentional and felony murder of guard Edward Cody. Because the indictment did not contain an allegation that the defendant intended to cause Cody's death, at an earlier stage of the proceedings, that part of the indictment was dismissed. Count six[14] charged the defendant both with intentional and felony murder of William West. The jury found the defendant guilty of felony murder in counts five and six and not guilty of intentional murder in count six.

[13] Count five of the indictment reads, in pertinent part, as follows:

"THE GRAND JURORS WITHIN AND FOR THE SAID COUNTY OF NEW HAVEN, accuse Donald Couture of murder in that, in violation of Section 53a-54a of the General Statutes, said . . . Donald Couture . . . did with intent to cause the death, cause the death of Edward Cody at Waterbury on or about April 16, 1979 and in that in violation of Section 53a-54 (c) of the General Statutes, said . . . Donald Couture . . . did commit robbery and in the course of and in furtherance of such robbery said participants or any one of them did cause the death of Edward Cody, not a participant in said robbery, at Waterbury on or about April 16, 1979, and in violation of Section 53a-54a.

A True Bill
/s/ Gerald M. Noonan
Foreman

June 6, 1979."

[14] Count six of the indictment reads, in pertinent part, as follows:

"THE GRAND JURORS WITHIN AND FOR THE SAID JUDICIAL DISTRICT OF WATERBURY, accuse Donald Couture of murder in that, in violation of Sec. 53a-54a of the General Statutes, said . . . Donald Couture . . . did with intent to cause the death, cause the death of William West at Waterbury on or about April 16, 1979 and in that in violation of Section 53a-54 (c) of the General Statutes said . . . Donald Couture . . . did commit robbery and in the course of and in furtherance of such robbery said participants or any one of them did cause the death of William West, not a participant in said robbery, at Waterbury on or about April 16, 1979, and in violation of Section 53a-54a.

A True Bill
/s/ Gerald M. Noonan
Foreman

June 6, 1979."

General Statutes § 53a-54a[15] in subsection (a) defines intentional murder. Section 53a-54c[16] defines felony murder. Subsection (c) of § 53a-54a prescribes the punishment for both intentional and felony murder. It is, therefore, proper in an indictment for felony murder to allege violation of §§ 53a-54c and 53a-54a (c). See *State* v. *Derrico,* 181 Conn. 151, 153, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed.

---

[15] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, providing nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[16] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

2d 607 (1980). The fact that the indictment alleged violation of § 53a-54a without specifically alluding to subsection (c) is of no consequence. "The language of an indictment serves two primary purposes: it informs the accused of the nature of the crime charged and it acts as a bar to future criminal proceedings on the same cause." *State* v. *Cofone,* 164 Conn. 162, 167, 319 A.2d 381 (1972). An indictment charging an accused with intentional and felony murder of a particular victim charges a single offense, committed conjunctively in two different ways. Id., 166; *State* v. *Edwards,* 163 Conn. 527, 532, 316 A.2d 387 (1972). Counts five and six initially charged both intentional and felony murder. Under such counts the jury may convict if it finds that the murder was committed in either or both of the ways alleged. When the first part of count five was dismissed the second part charging the defendant with felony murder remained. The defendant was on proper notice of the offense with which he was charged.

The court quite properly instructed the jury to disregard § 53a-54a in its consideration of the felony murder indictments. The jury is concerned only with the elements of the crime charged. The defendant does not claim nor is there a basis for a claim that the jury was not properly instructed on the elements of the crime of felony murder. The penalty provisions of § 53a-54a were not matters for the jury's consideration since it is not the jury's duty to pass upon the punishment of the accused. *State* v. *Wade,* 96 Conn. 238, 243, 113 A. 458 (1921); *State* v. *Main,* 75 Conn. 55, 63, 52 A. 257 (1902).

## IV

### Prosecutor's Summation

During the opening summation, Walter Scanlon, chief assistant state's attorney, reading from a prepared text, made a number of disparaging comments about the

defendant and his codefendant, characterizing them, inter alia, as "murderous fiends," "rats," "utterly merciless killers" and "inhumane, unfeeling and reprehensible creatures." The defendant's repeated objections to these remarks on the defendant's character were overruled and his requests for curative instructions were denied. At the conclusion of this opening summation, the defendant moved in the alternative for a mistrial or for the court to strike Scanlon's entire summation or those portions which the defendant recited on the record,[17] together with "the strongest possible instructions to the jury to disregard all such comments." The trial court denied the motion but at the conclusion of its instructions to the jury stated the following: "I specifically charge you not to be inflamed by the passionate nature of State's Attorney Scanlon's argument or by his repeated personal comments on the defendants. The defendants' character is not in issue. With respect to Mr. Scanlon's argument before you, I specifically charge you that you are not to consider any personal observations of his as to the guilt or innocence of the defendants, or as to the credibility of any witness."[18]

---

[17] A sample of the objectionable comments are as follows:

"I implore you not to forget that . . . the lives of three good men . . . were literally sacrificed to satisfy the greed of two murderous fiends."

"Now, it did not take you long, did it, ladies and gentlemen, to discover that this was not a case about cats and mice. No, ladies and gentlemen. It was a case about rats. And what else would you call some people who would lay in wait and shoot three men in the back except maybe cowards."

"After asking the dutiful wife [Donna Couture] a number of questions, the officers walked through the kitchen and entered the bedroom and found Couture beneath the bed garbed in only a pair of shorts, the macho, despicable coward number one."

"We have learned . . . they are cold blooded and merciless killers that took the lives of three good, decent and hard working men . . . ."

"What kind of person would lay in wait and attack three unsuspecting and almost defenseless men but shoot them in the back? They must be the most inhumane, unfeeling and reprehensible creatures that God has damned to set loose upon us."

[18] It is apparent from the record that the court and counsel discussed in advance the court's planned instructions. As a result of this discussion, the court incorporated in its instructions recommendations from counsel respecting several aspects of its charge.

In *State* v. *Carr,* 172 Conn. 458, 470, 374 A.2d 1107 (1977), we stated "that a prosecutor should avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence." Measured against this standard Scanlon's argument was improper. "It is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant. He has a right to *argue* that *the evidence* proves the defendant guilty as charged in the indictment, but for the *district attorney himself* to *characterize* the defendant as 'a cold-blooded killer' is something quite different. No man on trial for murder can be officially characterized as a murderer or as 'a cold-blooded killer,' until he is adjudged guilty of murder or pleads guilty to that charge." (Emphasis in original.) *Commonwealth* v. *Capalla,* 322 Pa. 200, 204, 185 A. 203 (1936).

But that is not the end of the inquiry. Because the right implicated is the defendant's due process right to a fair trial, we proceed next to an examination of the remarks to determine their likely impact. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Cosgrove,* 186 Conn. 476, 489, 442 A.2d 1320 (1982). "The question before us on this appeal is not, primarily, whether the remarks in question were proper or improper, but it is whether the action of the trial court in refusing to grant a new trial on account of them, in the exercise of its discretion, so far exceeded or abused the discretion committed to it in a matter of this kind as to warrant us in granting a new trial." *State* v. *Laudano,* 74 Conn. 638, 646, 51 A. 860 (1902). The question then is whether the remarks of the prosecution were so egregious that no curative instruction

could remove their prejudicial impact. If the characterization of the defendant consisted of an isolated remark we would conclude that the potential prejudicial impact on the jury could be obviated by a curative instruction. But here, where the prosecutor persisted in his invective and the defendant's repeated objections were overruled, the jury could only be left with the impression that the comments were proper. To suggest that an instruction would neutralize the prejudicial impact is to defy reality. "Not even appellate judges can be so naive as really to believe that all twelve jurors succeeded in performing what Judge L. Hand aptly called 'a mental gymnastic which is beyond, not only their powers, but anybody's else.' *Nash* v. *United States,* 54 F.2d 1006, 1007 (2d Cir. 1932)." *United States* v. *Bozza,* 365 F.2d 206, 215 (2d Cir. 1966).

When a defendant has been convicted of committing a number of heinous crimes on a record that does not permit serious doubt of his guilt, it is painful to reverse his conviction. Our constitution, however, does not condition constitutional rights on guilt or innocence. "Indeed, it is 'well established that serious prosecutorial misconduct, regardless of the prosecutor's intentions, may so pollute a criminal prosecution as to require a new trial, even without regard to the prejudice to the defendant.' *State* v. *Hafner,* [168 Conn. 230,] 251, [362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975)]. Crucial considerations in appellate adjudication of such questions are not only the need, where demonstrated, to discipline prosecutors where reprehensible conduct is present but to assure ultimate fairness to the defendant. *State* v. *Hafner,* supra, 252; see *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)." *State* v. *Binet,* 192 Conn. 618, 629, 473 A.2d 1200 (1984). Each case necessarily depends on its own facts and circumstances. If the challenged remarks occurred in the heat of a sum-

mation, if they were only isolated or brief episodes in a lengthy summation and if they were followed by a curative instruction, the weight of the evidence against the defendant could be a significant factor in upholding his conviction. See annot., 40 L. Ed. 2d 886, Due Process-Prosecutor's Statements. But here the prosecutor's prepared remarks were deliberate, facially improper, persistent and pronounced. In these circumstances the prosecutor's assertion that because of the strong evidence of the defendant's guilt his remarks should be found harmless has a hollow ring. "[A]ppeals to passion and prejudice may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial." *United States* v. *Socony-Vacuum Oil Co.,* 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129, reh. denied, 310 U.S. 658, 60 S. Ct. 1091, 84 L. Ed. 1421 (1940). The prosecutor cannot pollute the waters and then claim that we should ignore his actions because the fish are not worth saving. Given the egregious nature of the prosecutor's remarks, a failure on our part to reverse the defendant's conviction would suggest that in a strong case the defendant is not entitled to a fair trial and therefore anything goes. We conclude that in his opening summation the prosecutor's character assassination of the defendant so tainted the trial as to deny the defendant due process of law.

Article first, § 8 of the Connecticut constitution provides that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law . . . ." It is the prosecutor's duty to ensure that a defendant's conviction comports with this provision. As we stated in *State* v. *Ferrone,* 96 Conn. 160, 168–69, 113 A. 452 (1921) "[b]y reason of his office, [the prosecutor] usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because

he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment." Because the prosecutor's remarks denied the defendant a fair trial in violation of both the federal and state constitutions, the trial court erred not only in overruling the defendant's objections to the prosecutor's improper remarks but also in denying the defendant's motion for a new trial.

## V

### CONSECUTIVE SENTENCES—FELONY MURDER

The defendant was convicted of both the intentional and the felony murder of Leslie Clark and of the felony murders of Edward Cody and William West. He received separate sentences for the murder of each guard, the term (twenty-five years to life) of each sentence to be served consecutively. The defendant challenges the legality of these consecutive sentences both as a matter of statutory construction and as a violation of the double jeopardy clause of the fifth amendment to the United States constitution. We do not agree with the defendant's position in either respect.

Felony murder is a crime against the person. General Statutes § 53a-54c, which proscribes felony murder, provides in pertinent part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits . . . robbery . . . and, in the course of and in furtherance of such crime . . . he, or another participant . . . causes the death of a person other than one of the participants . . . ." Death caused in the course of and in furtherance of the underlying felony is an essential element of the crime of felony murder. *State* v. *MacFarlane,* 188 Conn. 542, 550, 450 A.2d 374 (1982); *State* v. *Morin,* 180 Conn. 599, 605, 430 A.2d 1297 (1980).

The statute refers to the death of "a person" in the singular. A fundamental purpose of the criminal law is to protect individual citizens from the criminal con-

duct of another. People are neither fungible nor amorphous. Where crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there are victims. *State* v. *Gunter,* 132 Ariz. 64, 70, 643 P.2d 1034 (1982); *State* v. *Irvin,* 603 S.W.2d 121 (Tenn. 1980); *Vigil* v. *State,* 563 P.2d 1344, 1351 (Wyo. 1977). As the Wyoming Court so aptly stated in *Vigil,* (p. 1351): "It must be noted that 'any human being' is in the singular and there is no indication that the defendant can get a bargain rate if he assaults a group of human beings."

There are no double jeopardy obstacles to our construction of the felony murder statute. The double jeopardy clause of the United States constitution protects against multiple punishments for the same offense. *North Carolina* v. *Pearce,* 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri* v. *Hunter,* 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). It does not prevent either multiple convictions or multiple punishment for multiple offenses. *State* v. *James,* 631 P.2d 854, 855–56 (Utah 1981).

There is error, the judgment is set aside and a new trial is ordered.

In this opinion PETERS, GRILLO and MENT, Js., concurred.

ARTHUR H. HEALEY, J., dissenting. I agree with the majority except for their resolution of the defendant's claim concerning the prosecutor's summation. At the outset, it must be made clear that I consider the prose-

cutor's remarks to be improper and unbecoming a representative of the state who, by virtue of his office, has the privilege of addressing the jury. "Cases brought on behalf of the [state of Connecticut] should be conducted with a dignity worthy of the client." *United States* v. *Sober,* 281 F.2d 244, 251 (3d Cir.) (Biggs, C.J., and Hastie, J., concurring), cert. denied, 364 U.S. 879, 81 S. Ct. 167, 5 L. Ed. 2d 101 (1960); see *United States* v. *Benter,* 457 F.2d 1174, 1177 (2d Cir.), cert. denied, 409 U.S. 842, 93 S. Ct. 41, 34 L. Ed. 2d 82 (1972). Further, I believe that the trial court, in view of the plaintiff's objections, should have ruled the prosecutor's remarks improper and should have given an immediate curative instruction. The analysis of whether a defendant in such circumstances is denied a fair trial, however, does not stop with these conclusions.

The defendant's claim is unquestionably aimed at a denial of his right to due process and a fair trial. Just last year in *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), we declared that "[t]he general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been deprived of the opportunity for a fair trial. . . . When a mistrial is sought on the ground that a prosecutor's improper remarks violated the defendant's constitutional right to due process of law the same standard applies. . . . The burden on the defendant is to show that the prosecutor's remarks were prejudicial in light of the entire proceeding. . . . The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . ." (Citations omitted.)

The dispositive issue in *Ubaldi* was "whether we should grant a new trial in order to deter prosecutorial

misconduct *which deliberately circumvents trial court rulings. . . ."* (Emphasis added.) Id., 569. Significantly, although we concluded that the prosecutorial misconduct in *Ubaldi* required a new trial in the absence of the showing of prejudice to the defendant, we reached that conclusion through the invocation of our supervisory powers. It is only in the context of circumstances such as those presented in *Ubaldi* which demand the exercise of our supervisory power that prosecutorial misconduct may require a new trial without a showing of prejudice to the defendant. Indeed, we expressly stated in *Ubaldi* that "[w]e are not . . . abandoning the due process analysis we have consistently applied to constitutional claims of prosecutorial misconduct *not involving purposeful disregard of a ruling, which requires the defendant to prove that he was deprived of a fair trial as the result of the misconduct in order to secure a new trial."* (Emphasis added.) Id., 575.

It cannot fairly be said that there was any purposeful disregard of a trial court ruling in this case such as there was in *Ubaldi* where we recognized that "upsetting a criminal conviction is a drastic step, but it is the only feasible deterrent to flagrant prosecutorial misconduct *in defiance of a trial court ruling."* (Emphasis added.) *State* v. *Ubaldi,* supra, 571. Although the prosecutor in this case "persisted" in his remarks despite repeated objections by defense counsel, these objections were overruled and, therefore, his persistence was hardly in defiance of a trial court ruling. The issue of the prosecutor's summation should, therefore, be decided under the due process analysis which we have "consistently applied." *State* v. *Ubaldi,* supra. In my view, the majority has unnecessarily departed from our well established and consistently applied due process analysis.

The majority in this case has determined that certain improper remarks of the prosecutor were so egre-

gious that no curative instruction could remove their prejudicial impact and, therefore, the defendant was denied a fair trial. This is so, according to the majority, because the prosecutor persisted in his improper remarks and the defense counsel's objections were overruled, thus leaving the jury with the impression that the remarks were proper despite the trial court's subsequent forceful curative instruction. In doing so, the majority has taken a quantum leap from the impropriety of the remarks to the conclusion that the defendant is entitled to a new trial without any meaningful analysis as to how the defendant was prejudiced to such a degree that he was denied his constitutional right to a fair trial. "The law is not indifferent to considerations of degree." *Schechter Poultry Corporation* v. *United States,* 295 U.S. 495, 554, 55 S. Ct. 837, 79 L. Ed. 1570 (1935) (Cardozo, J., concurring.) A conclusion that a prosecutor's remarks are egregiously improper does not, a fortiori, mean that a defendant is ipso facto entitled to a new trial where the trial court did not consider the remarks to be improper or calling for immediate action by the court.

In taking their giant step from the impropriety of the prosecutor's remarks and the concomitant overruling of the defendant's objections to the conclusion that the defendant was denied his constitutional right to a fair trial, the majority, without any meaningful analysis of how the defendant has established that the prosecutor's remarks denied him a fair trial, invokes Judge Learned Hand's chilling regard of a jury's ability to perform the "mental gymnastic" of actually disregarding certain matters when instructed to do so by the court. See *Nash* v. *United States,* 54 F.2d 1006, 1007 (2d Cir. 1932). The majority states that "[t]o suggest that an instruction would neutralize the prejudicial impact [of the prosecutor's remarks] is to defy reality."

In the context of this case, I cannot subscribe to the majority's "defy reality" rationale and I dissociate myself from their cynical view of the ability of the jury in this case to winnow the wheat that constitutes the evidence from the chaff that comes from the prosecutor's improper remarks. Indeed, even Judge Hand, in the very case in which he indulged in his "mental gymnastic" characterization of the inability of jurors to follow certain instructions, conceded that a direction to the jury to disregard certain matters "probably furthers, rather than impedes, the search for truth . . . ." *Nash* v. *United States,* supra; see *Bruton* v. *United States,* 391 U.S. 123, 135, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). Moreover, this court has taken the position that "[i]t is essential to any orderly trial that the jury be presumed, in the absence of a fair indication to the contrary, to have followed the instructions of the court as to the law." *State* v. *Bausman,* 162 Conn. 308, 314, 294 A.2d 312 (1972); *State* v. *Barber,* 173 Conn. 153, 157, 376 A.2d 1108 (1977); *State* v. *Coleman,* 167 Conn. 260, 268, 355 A.2d 11 (1974); *State* v. *Smith,* 156 Conn. 378, 383, 242 A.2d 763 (1968). The majority does not point to anything in the record to show that this well settled principle should not apply in this case where a forceful curative instruction was given to the jury before it began its deliberations. It must be remembered that "[u]nless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense." *Delli Paoli* v. *United States,* 352 U.S. 232, 242, 77 S. Ct. 294, 1 L. Ed. 2d 278 (1957); *Bruton* v. *United States,* supra. That makes good sense to me here particularly where the record shows nothing to the contrary.

I cannot conclude on this record that the prosecutor's improper remarks were so prejudicial that they "grani-

tized" the jury into a fixed position against the defendant leaving it unable to render a true verdict on the law and the evidence in keeping with the juror's oath. Reasonably viewed, even the human and practical limitations of the jury system does not justify the majority's cautious silence that this jury just could not and did not follow the trial court's instructions and decide this case solely on the law and the evidence. In *Mapp* v. *Ohio,* 367 U.S. 643, 657, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), the United States Supreme Court said that "[t]here is no war between the Constitution and common sense." I have grave concerns when I place that statement alongside the majority's view that this judgment must be set aside and a new trial ordered. It must not be overlooked that this case was not a "thin case" such as that in *State* v. *Binet,* 192 Conn. 618, 473 A.2d 1200 (1984). This case was one where the jury was presented with overwhelming evidence of guilt. While this does not and should not, in and of itself, operate to erase the impropriety of the prosecutor's remarks, it does "defy reality" for the majority aggressively to dilute the significance of that factor in assessing whether those remarks were so prejudicial that the defendant was denied a fair trial in the light of the entire proceeding.

The question then comes down to this: In this case of overwhelming evidence of guilt did the prosecutor's improper remarks cause substantial prejudice to the defendant so as to deprive him of his constitutional right to a fair trial?

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); see *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982).

The aim of due process "is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Smith* v. *Phillips,* supra, 219, quoting *Brady* v. *Maryland,* supra. "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial." *Lisenba* v. *People of the State of California,* 314 U.S. 219, 236, 62 S. Ct. 280, 86 L. Ed. 166 (1941), reh. denied, 315 U.S. 826, 62 S. Ct. 620, 85 L. Ed. 1222 (1942).

The prosecutor's remarks, as already pointed out, were not in defiance of the trial court's rulings. The trial court's instructions to the jury concerning the prosecutor's argument, although not given immediately, were forceful and clear.[1] The record provides no basis and the majority offers no reasoning which could demonstrate that the jury could not and did not follow these instructions. Moreover, the prosecutor's remarks at issue are the only prosecutorial misconduct complained of during this long trial. Significantly, the state's case against the defendant was so overwhelming that the jury in all probability would have returned a verdict of guilty on the law and the evidence even if the prosecutor had not made his improper remarks. It seems to me that it is proper to ask what effect the improper remarks had or may reasonably be taken to have had upon the jury and its decision; that is the effect on the minds of twelve other people, not ours, viewed in light

---

[1] At the conclusion of the charge, before the exceptions were taken, the trial court told the jury, inter alia: "Let me explain about exceptions. Counsel, all of them, have been most cooperative, and we have been over the charge together at length ahead of time so that many of what might have now been taken as objections or exceptions to my charge have been ironed out. And, I have accepted his, or his, or his recommendation. . . . So, we sat down together and went over all of this." Thereafter, the jury was excused and the exceptions taken.

of the entire trial and not in isolation. Even weighing how others might react, we still cannot weigh our appellate reaction without at least conceding, absent some definite contrary indication, that this jury was capable of acting reasonably. I believe they were so capable. I must therefore conclude that this record does not demonstrate that prejudice which would enable me to conclude that this defendant was deprived of his constitutional right to a fair trial under either the United States or Connecticut[2]

[2] I am now constrained, on December 18, 1984, to write the following addendum to my dissenting opinion, originally released on October 2, 1984, because I note that the amendment now made to the majority opinion, at page 565, inserts the language: "Because the prosecutor's remarks denied the defendant a fair trial in violation of both the federal and state constitution."

Without analyzing whether the apparent ambiguity of the exact basis of the majority's disposition of this issue is augmented by this amendment, I readily admit that I, like the majority, overlooked one significant matter in originally writing my dissent. I refer to the ground of the defendant's claim as stated in his brief on the issue of the prosecutor's summation. His appellate brief, at pages ii and 32, frames this claim as follows: "The prosecutor's improper and inflammatory summation deprived the appellant of his fourteenth amendment right to due process of law." There is nothing ambiguous about this claim as stated; it is specifically made, not under the Connecticut constitution, but rather under the United States constitution. Moreover, the defendant's brief on this issue does not disclose a single reference to our state constitution. The state's appellate brief on the summation issue, which argues that the prosecutor's summation was proper, responds to the defendant's due process claim that was asserted under the fourteenth amendment of the federal constitution.

We have often said that a claim of error not briefed is considered to have been abandoned. See, e.g., *State* v. *Perez*, 183 Conn. 225, 228 n.3, 439 A.2d 305 (1981); *State* v. *Ruiz*, 171 Conn. 264, 265, 368 A.2d 222 (1976). We have pointed out that where a violation of the fourteenth amendment to the United States constitution was not claimed in the appellant's preliminary statement of issues, in addition to not being briefed, that claim was not part of the appeal. *Bencivenga* v. *Milford,* 183 Conn. 168, 176 n.10, 438 A.2d 1174 (1981). This court has also determined that "[a]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court . . . [and] [t]his also applies to constitutional claims." (Citations omitted.) *Rodriguez* v. *Mallory Battery Co.,* 188 Conn. 145, 149, 448 A.2d 829 (1982). Several months ago we invoked this well established practice in refus-

constitutions. I would find no error on this appeal. Accordingly, I dissent.

---

ing to review an appellant's due process claim made under the Connecticut constitution. *Hayes* v. *Smith,* 194 Conn. 52, 66, 480 A.2d 425 (1984). None of these circumstances even approaches this suggested "claim" under the Connecticut constitution in this case for the simple reason no such "claim" has been made, briefed, or argued before us. It is only now, some time after the decision in this case was released on October 2, 1984, that the majority is "amending" its opinion apparently to place its resolution of the summation issue on both federal and state constitutional grounds. As already pointed out, the state constitutional ground has never even been presented to this court.

There can be no question about a state court's independent responsibility for its state constitutional law. Recently the United States Supreme Court reiterated: "It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), quoting *Minnesota* v. *National Tea Co.,* 309 U.S. 551, 557, 60 S. Ct. 676, 84 L. Ed. 920 (1940). The statement that independent interpretation of state constitutional provisions is now well established does not require citation of authority. On the other hand, the determination by the majority that our state constitution has been violated without any such claim having been made not only subserves our well established appellate practice, but also in this case impermissibly exceeds any recognized right of independent interpretation of our state constitution.

In view of the fact that the majority has now amended its opinion, I maintain the position that this defendant's right to a fair trial was not violated under either the federal or the Connecticut constitution.